LICORERÍA TRIGO, INC., demandante y recurrente, *v.* SECRETARIO DE HACIENDA, demandado y recurrido.

*Número:* R-65-201     *Resuelto:* 7 de abril de 1967

*Brown, Newsom, Córdova & Díaz,* abogados de la recurrente; *J. B. Fernández Badillo, Procurador General, J. F. Rodríguez Rivera, Procurador General Interino,* y *Elpidio Arcaya, Procurador General Auxiliar,* abogados del recurrido.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Blanco Lugo, Rigau y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

La recurrente, *Licorería Trigo, Inc.,* fue de octubre de 1960 a octubre de 1961 la importadora exclusiva del Brandy Domecq Tres Cepas. Dicho producto fue vendido exclusivamente a *Trigo Hermanos, Inc.* por el precio que no excedió de $5.00 por "galón medida," excluyendo los impuestos de rentas internas. ([1])

Las importaciones de dicho brandy resultaron en la imposición de impuestos al tipo de $6.00 por galón medida, los que pagó la recurrente antes de levantar los embarques de la aduana.

La disposición legal que autorizaba la imposición de dichos impuestos se encuentra en 13 L.P.R.A. sec. 1531 que en su parte pertinente lee como sigue:

"Se impondrá, cobrará y pagará por una sola vez sobre los siguientes productos que se tengan en depósito o que hayan sido o puedan ser en lo sucesivo destilados, rectificados, producidos, fabricados, importados o introducidos en Puerto Rico, un impuesto de rentas internas a los tipos siguientes:

(1) (a) Todo espíritu destilado que se obtenga a través de la fermentación y destilación de cualesquiera productos que no sean derivados de la caña de azúcar, de menos de 100 grados prueba cuyo 'precio al por mayor en el mercado de Puerto Rico' por galón medida no exceda de cinco (5) dólares pagará un impuesto de seis (6) dólares sobre cada galón medida y un

---

([1]) La ley define "galón medida" como "la medida normal para líquidos, reconocida universalmente con una capacidad de 231 pulgadas cúbicas." 13 L.P.R.A. sec. 1474(17). En la nueva Sec. 1474 dicha definición aparece en el inciso 20. Véase el Suplemento.

impuesto proporcional a igual tipo sobre toda fracción de galón medida.

Todo espíritu destilado que se obtenga a través de la fermentación y destilación de cualesquiera productos que no sean derivados de la caña de azúcar, de menos de 100° prueba cuyo 'precio al por mayor en el mercado de Puerto Rico' por galón medida exceda de cinco (5) dólares pero no de veinte (20) dólares pagará un impuesto de nueve (9) dólares sobre cada galón medida y un impuesto proporcional a igual tipo sobre toda fracción de galón medida." (2)

■ La ley definía el término "precio al por mayor en el mercado de Puerto Rico" en esta forma: "Significa el más alto de los precios, excluyendo los impuestos prescritos en este Subtítulo, cargados o cobrados, directa o indirectamente, por el introductor o fabricante, según sea el caso, distribuidor o mayorista *al detallista*." 13 L.P.R.A. sec. 1474(28). (Énfasis nuestro.)

En una carta del Director del Negociado de Impuestos sobre Bebidas Alcohólicas dirigida a Trigo Hnos., Inc., fechada el 30 de abril de 1959, dicho funcionario expresó que "el precio al por mayor para fines de determinar el tipo de impuesto que regirá sobre cierto espíritu destilado es aquél que establece el importador o fabricante al vender dicho licor."

■ Posteriormente el Secretario de Hacienda se enteró de que cuatro importadores de bebidas alcohólicas estaban utilizando una práctica llamada "Trampolín" en la importación y pago de los arbitrios. En la vista de este caso el Subdirector del Negociado de Bebidas del Departamento de Hacienda explicó en qué consistía el llamado "Trampolín." Dijo:

" 'Trampolín' es una práctica. La llaman así los comerciantes importadores. Esa práctica comercial consistía en designar un

---

(2) En el curso de esta opinión diremos la ley "autorizaba" y la ley "definía," etc. en vez de decir "autoriza" y "define," etc. porque la Ley de Espíritus y Bebidas Alcohólicas fue enmendada por la Ley Núm. 69 de 20 de junio de 1963, 13 L.P.R.A. secs. 1474 y ss., Suplemento.

importador ficticio, que actuaba como importador inmediato de la mercadería a Puerto Rico, y éste se la traspasaba inmediatamente al verdadero importador. El ficticio, al traspasar al verdadero, le facturaba a un precio, al verdadero, que justificaba el pago del impuesto en la escala más baja. De esta manera, el verdadero importador la revendía a los detallistas a precios superiores, que justificaban la imposición de un impuesto superior." (T.E. págs. 9–10.)

El Departamento de Hacienda investigó y encontró "que había cuatro firmas importadoras que estaban comprando, adquiriendo, todos los embarques de determinados productos que traen otras firmas. Esas otras firmas no le vendían a sus clientes, sino exclusivamente a las firmas mayoristas esas." (T.E. pág. 11.)

Es significativo el siguiente intercambio que tuvo lugar durante el juicio mientras declaraba el Subdirector del Negociado de Bebidas del Departamento de Hacienda. Representaba a la demandante el Lcdo. Enrique Córdova Díaz y a los demandados el Lcdo. Elpidio Arcaya. Presidía la Sala el Juez Honorable Plinio Pérez Marrero.

LIC. ARCAYA:
"P. ¿Usted podría informar si, dentro de esos comerciantes importadores que se valieron del 'trampolín,' estaba incluída la Licorería Trigo, Inc.?"

LIC. CÓRDOVA DÍAZ:
"R. Sí, señor. Era una de las que, por un período específico, se dedicó a importar el Brandy Domecq Tres Cepas. De octubre de 1960 a octubre de 1961. Que anteriormente a esas fechas y con posterioridad a esas fechas, el importador exclusivo del Brandy ése había sido Trigo Hermanos, Inc.

LIC. CÓRDOVA DÍAZ: Ese hecho está, específicamente, estipulado.

HON. JUEZ PÉREZ MARRERO:
El está interpretando o explicando.
P—De acuerdo con su declaración, ¿Licorería Trigo, Inc., era el 'trampolín'?
R—Era el 'trampolín'.

LIC. CÓRDOVA DÍAZ:

Formaba parte del 'trampolín'." (T.E. págs. 11–12.)

Se le preguntó al testigo que qué determinaciones hizo el Secretario de Hacienda al descubrir la práctica del trampolín y el testigo declaró lo siguiente:

"El Secretario citó a todos los importadores en Puerto Rico, de bebidas alcohólicas, y les advirtió sobre esta práctica, que él entendía que era mala y les dio cierto término para que liquidaran esas existencias en las cuales se habían pagado esos impuestos y se había comerciado con ellas bajo la práctica de 'trampolín.' Para tener conocimiento y para futura acción del Departamento, se hicieron inventarios físicos de esas existencias al 31 de octubre y 30 de noviembre de 1961. Teníamos conocimiento de las existencias en poder de cada uno de estos señores, con impuestos mucho más bajos en la escala fijados por ley, al 31 de octubre de 1961. Se hizo otro inventario físico de existencias en poder de traficantes mayoristas al 30 de noviembre de 1961. Estas normas continuaron después del primero de diciembre, vendiendo las bebidas alcohólicas al precio que justificaban un impuesto mayor al que pagaron, por lo que fueron notificadas todas las firmas de esta deficiencia, para que pagaran la diferencia sobre esos inventarios, a esa fecha. De esas firmas, tres pagaron." (T.E. págs. 12–13.)

El Secretario de Hacienda envió el 31 de agosto de 1961 a los importadores de bebidas alcohólicas, entre ellos la Licorería Trigo, Inc., una Carta Circular donde les comunicaba con dos meses de anticipación que "A partir del 1ro de noviembre de 1961, el tipo de impuesto estatal sobre vinos y bebidas fuertes no derivados de la caña de azúcar producidos o importados en Puerto Rico se fijará sobre el precio al por mayor más alto que se cobre, excluyendo los impuestos, por el introductor o fabricante, distribuidor o mayorista según sea el caso, al detallista." Exh. 3 de la Estipulación.

Les indicó en dicha carta el Secretario que "se ha fijado la fecha de 1 de noviembre de 1961 con el fin de que las compras de licores en tránsito al presente puedan ser intro-

ducidas en el mercado de Puerto Rico bajo la norma en vigor."

El 2 de noviembre de 1961, el Secretario de Hacienda envió a la Licorería Trigo, Inc., una carta donde dice que considerando que para el 1ro de noviembre de ese mismo año, "habrá en poder de mayoristas, no importadores, existencias de vino y bebidas fuertes no provenientes de la caña de azúcar, cuyos impuestos han sido pagados bajo la norma anterior al tipo menor, y que por venderse al detallista a un precio al por mayor que justifica el pago del impuesto al tipo más alto de acuerdo con la nueva norma, vendría el importador de dichos licores obligado a pagar la diferencia en el arbitrio, se concede un plazo de 30 días contados desde el 1° de noviembre de 1961 para que dichas existencias sean liquidadas." Exh. 4 de la Estipulación.

El 1ro. de diciembre la firma Trigo Hnos., Inc., tenía 8,996 cajas (15,013.20 galones medidas) sin vender de las 34,900 cajas que le había comprado a la Licorería Trigo, Inc. Estas cantidades pagaron impuestos de $6.00 en vez de $9.00 como exigía la ley. (³)

En 28 de marzo de 1962 el Secretario de Hacienda notificó a la demandante una deficiencia por concepto de arbitrios en relación con las 8,996 cajas de Brandy Domecq Tres Cepas. El Secretario le concedió seis plazos a la Licorería Trigo, Inc., para pagar dicho arbitrio, el cual ascendía a $53,159.49 incluyendo intereses. Ese era el importe de los $3.00 por galón dejados de pagar por la demandante, o sea, la diferencia entre el arbitrio pagado de $6.00 y el que exigía la ley de $9.00.

La recurrente pagó bajo protesto y solicitó del Secretario de Hacienda el reintegro de dicho pago en 8 de mayo de 1963.

---

(³) Trigo Hnos., Inc., vende dicho licor a un precio mayor de $5.00 y menor de $20.00, lo cual le hace aplicable el impuesto de $9.00 por galón medida, a tenor con el segundo párrafo del inciso 13 L.P.R.A. sec. 1531(1)(a) antes citado.

En 23 de mayo de 1963 el Secretario denegó dicha solicitud de reintegro.

El 28 de mayo de 1963 la recurrente entabló una demanda para el reintegro de los arbitrios. Alegó que la imposición de la deficiencia por concepto de arbitrios era ilegal por los siguientes fundamentos: (a) por entender que los $3.00 por galón que el Secretario le cobraba, lo cual era la diferencia entre los $6.00 pagados y los $9.00 que debía pagar, era un "arbitrio adicional" que no estaba autorizado por la ley; (b) porque creía que ya había pagado "la totalidad" de los arbitrios en cuestión y que ya no procedía que se le cobrasen arbitrios adicionales algunos; y (c) porque la demandante Licorería Trigo, Inc., importó y vendió el Brandy que es objeto de los arbitrios antes del 1ro. de diciembre de 1961 y no incluyó en su precio de venta el "arbitrio adicional" que aquí se discute.

Celebrada la vista del caso, el Tribunal Superior declaró sin lugar la solicitud de reintegro. Accedimos a la petición de la demandante-recurrente de revisar el asunto y expedimos el auto.

En su solicitud de revisión la recurrente expone los siguientes fundamentos para atacar la validez del arbitrio:

(1) que "el pronunciamiento de 2 de noviembre de 1961 no era una interpretación del estatuto sino un decreto legislativo, fue aplicado retroactivamente y por lo tanto su aplicación era inválida y en violación de las disposiciones del estatuto y la norma nueva efectiva en 1ro de noviembre de 1961;"

(2) que "la nueva norma interpretativa efectiva en 1 de noviembre de 1961 era claramente errónea;"

(3) que "la determinación y cobro de los impuestos originales quedaron finales y definitivos y el Secretario no tuvo poderes ni autoridad de hacer una nueva determinación y cobro, ni expedir una deficiencia;"

(4) que "la imposición adicional de contribuciones priva a la demandante-recurrente de su propiedad sin el debido proceso de ley."

En su alegato (pág. 12) argumenta la recurrente que la sentencia dictada por el Tribunal Superior debe ser revocada "porque dicho Tribunal a nuestro entender cometió los siguientes errores:"

"I.—El Tribunal cometió error al resolver que el pago de los arbitrios al ser importado el Brandy no quedó final y definitivo.

II.—El Tribunal Superior cometió error al no dar fuerza de ley a la norma interpretativa continuada en vigor hasta 1 de noviembre de 1961 por el Secretario de Hacienda y al resolver que dicho Secretario tuvo los poderes de revocarla con efecto retrospectivo.

III.—El Tribunal Superior cometió error al resolver que las operaciones de la demandante-recurrente constituyeron la evasión del pago de los arbitrios prescritos por el estatuto."

En la argumentación del primer error expresa la recurrente que la carta circular de 2 de noviembre de 1961 era un decreto legislativo y que tal actuación está en violación de los términos del estatuto. Argumenta que el estatuto dispone "que los impuestos se imponen, pagan y cobran antes de retirar los espíritus de la aduana o compañía naviera, y que el impuesto se impondrá, cobrará y pagará por una sola vez, siendo el suceso tributable la importación."

La recurrente en su argumentación parte de una base incorrecta al clasificar la norma establecida el 2 de noviembre de 1961 por el Secretario de Hacienda como un decreto legislativo. No lo es. La norma en cuestión es una interpretativa. Explica lo que se ha de entender por el tipo impuesto a base de *la propia definición que daba el estatuto* a la frase "precio al por mayor en el mercado de Puerto Rico," el cual era el más alto de los precios, excluyendo impuestos, cobrados por el introductor o mayorista al detallista. 13 L.P.R.A. sec. 1474(28).

La aseveración de que el pago del arbitrio quedó final y definitivo por el mero hecho de que al importar los espíritus

el pago fue aprobado por el Secretario de Hacienda, descansa en un error que a continuación explicamos.

■ El estatuto disponía (y su nuevo texto también dispone) que "se impondrá, cobrará y pagará por una sola vez . . . un impuesto de rentas internas a los tipos siguientes: . . ." 13 L.P.R.A. sec. 1531. Tal disposición no implica que cuando surge una obligación contributiva el pago de una parte de la misma impide el cobro del balance. Lo que significa dicha disposición es que no se impondrá contribución adicional alguna, después de pagado el impuesto *en su totalidad*.

En el presente caso sólo se pagó un impuesto de rentas internas de $6.00 a base del precio a que vendió Licorería Trigo, Inc., a Trigo Hermanos, Inc. Las partes aceptan que de haberse utilizado como base el precio a que se vendió *al detallista* "resultaría ser de $9.00 por galón medida" el impuesto. (Estipulación Núm. 15.) Precisamente eso es lo que decía la ley aplicable: el "precio al por mayor en el mercado de Puerto Rico," significa el precio más alto, excluyendo impuestos, cobrados al detallista. 13 L.P.R.A. sec. 1474(28).

■ La contención de la recurrente es que por haberse pagado ya $6.00 como impuesto por galón medida, cuando la obligación era de $9.00, el Secretario de Hacienda no puede cobrar la diferencia. No estamos de acuerdo. El pago del impuesto en una cantidad menor que la debida no convierte dicho pago en uno final y definitivo y no salda la obligación que en efecto impone la ley. Las leyes que imponen contribuciones, como cualesquiera otras, deben recibir una interpretación razonable que tienda a llevar a efecto el propósito y la intención del legislador. No se cometió el primer error señalado.

Se señala como segundo error el hecho de que el Tribunal Superior no dio fuerza de ley "a la norma interpretativa

continuada en vigor hasta 1ro. de noviembre de 1961 por el Secretario de Hacienda y al resolver que dicho Secretario tuvo los poderes de revocarla con efecto retrospectivo."

En efecto el Secretario de Hacienda sustituyó la anterior norma de 1959 (la cual establecía que "el precio al por mayor para fines de determinar el tipo de impuesto que regirá sobre cierto espíritu destilado es aquél que establece el importador o fabricante al vender dicho licor") por la de 1ro. de noviembre de 1961, la cual establece que "el tipo de impuesto estatal sobre vinos y bebidas fuertes no derivados de la caña de azúcar producidos o importados en Puerto Rico se fijará sobre el precio al por mayor más alto que se cobre, excluyendo los impuestos, por el introductor o fabricante, distribuidor o mayorista según sea el caso, al detallista."

Lo que realmente ocurrió cuando el Secretario emitió su nueva norma o instrucción ("*ruling*") de 1ro. de noviembre de 1961 no fue que legislase o que cambiase la posición del Departamento sobre lo que daba base al cobro del impuesto, sino que lo que ocurrió fue que al percatarse el Secretario de Hacienda del ardid del "trampolín" varió el lenguaje de su instrucción para evitar la evasión del pago del impuesto antes descrita. (4)

Anteriormente la norma establecía que el precio para fines de determinar el tipo de impuesto era "aquél que establece el importador o fabricante al vender dicho licor." A este lenguaje las cuatro firmas que utilizaron el "trampolín" le buscaron la vuelta. En el caso de autos una corporación "importadora" le vendía a determinado precio a una corporación hermana y ésta a su vez vendía hacia adelante. El resultado era que en vez de pagar el impuesto de $9.00 por galón pagaba solamente $6.00. Cuando el Secretario llevó

---

(4) Como cuestión de realidad Trigo Hnos., Inc., volvió a asumir la función de importadora después de octubre de 1961, función que ejercía antes de octubre de 1960.

esto a la atención de las cuatro firmas que estaban incurriendo en esa práctica, tres pagaron. No así la recurrente. El nuevo lenguaje de la norma o instrucción del Secretario, de 1ro. de noviembre de 1961, redactado ya con la experiencia antes mencionada, sigue más de cerca la letra y la intención del estatuto. Establece que "el tipo de impuesto estatal sobre vinos y bebidas fuertes no derivados de la caña de azúcar producidos o importados en Puerto Rico se fijará sobre el precio al por mayor más alto que se cobre, excluyendo los impuestos, por el introductor o fabricante, distribuidor o mayorista según sea el caso, al detallista." Basta comparar el lenguaje de la nueva norma—que esencialmente fue una enmienda a la anterior—para notar que la nueva norma sigue muy de cerca, y a veces literalmente, la anteriormente citada disposición de la ley que definía "precio al por mayor en el mercado de Puerto Rico." 13 L.P.R.A. sec. 1474(28).

■ Ni el Secretario ni el contribuyente pueden variar o modificar lo que dice la ley. El Secretario hace su interpretación de la ley, como también la hace el contribuyente, y en caso de discrepancia y de surgir un pleito, es a los tribunales a quienes compete interpretar y aplicar la misma.([5]) Y como bien admite la propia recurrente en su extenso—y en cuanto a su organización y formato, impecable—alegato (pág. 15) la norma ("*ruling*") interpretativa del Secretario no es nula por el mero hecho de su efecto retroactivo. Si, como en este caso, la nueva norma o instrucción tiene el efecto de corregir o mejorar una anterior para conformarla más adecuadamente al estatuto, la retroactividad de la nueva norma no la hace nula o ilegal. *Manhattan General Equipment Co.* v. *Commissioner of Internal Revenue*, 297 U.S. 129 (1936). Véase también, *Samann* v. *C.I.R.*, 313 F.2d

---

([5]) En el mismo sentido de lo antes dicho, puede verse Arvold, *Treasury Regulations and the Wilshire Oil Case*, 40 Colum. L. Rev. 252, 261 (1940).

461 (1963); *Slavenburg Corp.* v. *United States,* 207 F.Supp.
314 (1962); *Granquist* v. *Hackleman,* 264 F.2d 9 (1959);
*Royer's Inc.* v. *United States,* 163 F.Supp. 225 (1958); *Functional Music Inc.* v. *F.C.C.,* 274 F.2d 543 (1958); *Fed. Dep.
Ins. Corp.* v. *Continental Ill. Nat. E. & T. Co.,* 245 F.2d 567
(1957); *United States* v. *Missouri Pac. R.R. Co.,* 278 U.S.
269 (1928); Griswold, *A Summary of the Regulations Problem,* 54 Harv. L. Rev. 398 (1941).(⁶) Tampoco se cometió el
segundo error señalado.

Se señala como tercer error el "resolver que las operaciones de la demandante-recurrente constituyeron la evasión
del pago de los arbitrios prescritos por estatuto." No es
necesario discutir esta cuestión ya que, como concluyó el
Tribunal de instancia, a base de la prueba presentada estuvo
en lo correcto dicho Tribunal al determinar que no hay duda
de que la ley autorizaba la forma de imponer los arbitrios
anunciada por el Secretario a ser efectiva de noviembre 1ro.
de 1961 en adelante.

■ Como hemos visto, la enmienda de la norma era necesaria. El lenguaje anterior (precio a que vendía el importador) no sólo no refleja bien la letra y la intención de la
ley (precio cobrado al detallista) sino que podía dar lugar,
como de hecho dio, a maniobras para crear un precio con-

---

(⁶) Resolviendo en el sentido arriba dicho, el Tribunal Supremo de los
Estados Unidos, en *Manhattan Gen. Equip. Co.* v. *Commissioner of Int.
Rev.,* supra, se expresó, a la pág. 135, como sigue:

"The contention that the new regulation is retroactive is without
merit. Since the original regulation could not be applied, the amended
regulation in effect became the primary and controlling rule in respect of
the situation presented. It pointed the way, for the first time, for correctly
applying the antecedent statute to a situation which arose under the
statute. [Citations omitted.] The statute defines the rights of the taxpayer
and fixes a standard by which such rights are to be measured. The regulation constitutes only a step in the administrative process. It does not,
and could not, alter the statute. It is no more retroactive in its operation
than is a judicial determination construing and applying a statute to a
case in hand."

tributivo ficticio. Como dijimos anteriormente en *J. E. Candal & Co.* v. *Rivera*, 86 D.P.R. 508, 513 (1962), "resolver lo contrario en este caso sería permitir el uso del artificio corporativo para evadir el cumplimiento de obligaciones legítimas." ([7]) *Schenley Corp.* v. *United States*, 326 U.S. 432, 437 (1946); *South P.R. Sugar* v. *Junta Azucarera*, 88 D.P.R. 43 (1963) y autoridades allí citadas.

*Se confirmará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en este caso, en 14 de septiembre de 1965.*

---

([7]) Los accionistas de ambas corporaciones son:

*Licorería Trigo, Inc.*

*Trigo Hnos., Inc.*

| | |
|---|---|
| Juan Trigo-Orbeta | 2,346-2/3 |
| Benigno Trigo-Orbeta | 2,346-2/3 |
| Dionisio Trigo-Orbeta | 2,346-2/3 |

Benigno Trigo-González y Dionisio Trigo-González tienen 106-2/3 acciones cada uno en Trigo Hnos., Inc., y aunque no tienen acciones en Licorería Trigo, Inc., son directores de ambas corporaciones. Las restantes 736-2/3 acciones de Trigo Hnos., Inc., son poseídas por otras 6 personas todas de la misma familia Trigo.